## VITO COVELLI v. COMMISSIONER OF REVENUE SERVICES
## (15198)

Peters, C. J., and Callahan, Borden, Berdon, Norcott, Katz and Palmer, Js.

Argued September 19—decision released December 19, 1995

*Aaron S. Bayer,* deputy attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Gregory T. D'Auria* and *Anne O'Leary,* assistant attorneys general, for the appellant (defendant).

*Frank W. Louis,* for the appellee (plaintiff).

*Susan C. Marks,* supervisory assistant state's attorney, filed a brief for the state division of criminal justice as amicus curiae.

CALLAHAN, J. The sole issue in this appeal[1] is whether, pursuant to General Statutes § 12-651 (a)[2] the defendant, the commissioner of revenue services (commissioner), may collect a tax on illegal drugs assessed against the plaintiff, Vito Covelli, after the plaintiff had been arrested, prosecuted, convicted and sentenced for the possession of those same drugs with intent to sell in violation of General Statutes § 21a-277 (a).[3] The com-

---

[1] The state appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[2] General Statutes § 12-651 provides: "Imposition of tax on marijuana and controlled substances. Stamps. (a) A tax is imposed on any marijuana or controlled substances purchased, acquired, transported or imported into the state. Payment thereof shall be evidenced by the permanent affixing of stamps on the marijuana or controlled substance immediately after receipt. Each stamp or other official indicia may be used only once.

"(b) The tax imposed pursuant to this section shall be at the following rates: (1) On each gram of marijuana or portion of a gram, three dollars and fifty cents, and (2) on each gram of a controlled substance, or portion of a gram, two hundred dollars or on each fifty dosage units of a controlled substance that is not sold by weight, or portion thereof, two thousand dollars. For the purpose of calculating the tax due under this section, an ounce of marijuana or other controlled substance is measured by the weight of the substance in the dealer's possession.

"(c) Any tax imposed pursuant to this section is due and payable immediately upon acquisition or possession in this state by a dealer."

[3] General Statutes § 21a-277 provides in relevant part: "Penalty for illegal manufacture, distribution, sale, prescription, dispensing. (a) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and impris-

missioner appeals from the trial court's judgment prohibiting the imposition of the tax as violative of the double jeopardy clause of the fifth amendment to the United States constitution.[4] Relying on the United States Supreme Court's holding in *Dept. of Revenue of Montana* v. *Kurth Ranch*, 511 U.S. 767, 114 S. Ct. 1937, 128 L. Ed. 2d 767 (1994), the trial court concluded that the double jeopardy clause was violated when the plaintiff, after having been punished criminally for possession of illicit drugs, subsequently was assessed a tax based upon his possession of those same illicit drugs. In reaching this conclusion, the trial court determined that the tax imposed pursuant to Connecticut's Marijuana and Controlled Substances Tax Act (act); General Statutes §§ 12-650 through 12-660; was punishment for purposes of double jeopardy analysis. We reverse the judgment of the trial court.

The relevant facts are undisputed. On November 5, 1992, state police officers searched the plaintiff's place of business in Colebrook, the Route 8 Cycle Shop, as well as a black Ford pickup truck and a trailer located on the premises. As a result of their search, the police discovered approximately one-half pound of cocaine. The plaintiff subsequently was arrested for possession of cocaine with intent to sell in violation of § 21a-277 (a).

Immediately after seizing the cocaine, the state police submitted a drug tax referral form to the department of revenue services.[5] The referral form noted that the

oned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

[4] The fifth amendment to the United States constitution is made applicable to the states by the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 787, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969); *State* v. *Woodson*, 227 Conn. 1, 7, 629 A.2d 386 (1993).

[5] The Marijuana and Controlled Substances Tax Act does not mandate that law enforcement agencies submit these referral forms to the department of revenue services. General Statutes § 12-657, however, gives the commis-

police had discovered 1250 grams of cocaine in the plaintiff's possession and indicated that the drug stamps required by § 12-651 (a) had not been affixed to the drugs. As a result of the information contained in the referral form, the commissioner, pursuant to General Statutes § 12-655 (b),[6] assessed an initial tax deficiency against the plaintiff. On December 21, 1993, the commissioner sent the plaintiff a final determination letter informing him that he owed $255,631 in tax pursuant to § 12-651, $255,631 as a penalty pursuant to General

sioner of revenue services discretion to promulgate regulations reasonably necessary to carry out the intent and purpose of the act. Pursuant to this authority, the commissioner established a procedure whereby law enforcement officials could submit to the department of revenue services in cases of suspected delinquency a referral form indicating the type and amount of drugs seized. Connecticut Informational Publication, IP 92 (7): Questions and Answers for the Criminal Justice and Law Enforcement Agencies on the Connecticut Marijuana and Controlled Substances Tax (Dept. of Revenue Services 1992).

[6] General Statutes § 12-655 (b) provides in relevant part: "If, after an examination of the invoices, books and records of a dealer, or if, from any other information obtained by him or his authorized agents, the commissioner determines that the dealer has not purchased sufficient stamps to cover his receipts and sales or other disposition of any marijuana or controlled substances, he shall thereupon assess the deficiency in tax. There shall be added thereto a penalty of ten per cent of the deficiency or fifty dollars, whichever amount is greater, and interest at the rate of one and one-fourth per cent per month from the due date of such tax to the date of payment. In any case where a dealer cannot produce evidence of sufficient stamp purchases to cover the receipt of any marijuana or controlled substances, it shall be presumed that such marijuana or controlled substances were sold without having the proper stamps affixed. If the commissioner determines that the deficiency or any part thereof is due to a fraudulent intent to evade the tax, there shall be added as a penalty twenty-five per cent of the deficiency and interest at the rate of one and one-fourth per cent per month or fraction thereof from the due date of such tax to the date of payment. Subject to the provisions of section 12-3a, the commissioner may waive all or part of the penalties provided under this chapter when it is proven to his satisfaction that the failure to pay any tax on time was due to reasonable cause and was not intentional or due to neglect. The amount of any tax, penalty or interest due and unpaid under the provisions of this chapter may be collected under the provisions of section 12-35. The warrant therein provided for shall be signed by the commissioner or his authorized agent. . . ."

Statutes § 12-660 (a),[7] plus interest of $41,540.04 pursuant to § 12-655 (b), for a total amount due of $552,802.04.[8]

On February 15, 1994, the plaintiff, in his criminal case, entered a plea of nolo contendere to the charge of possession of cocaine with intent to sell in violation of § 21a-277 (a). The court sentenced the plaintiff to nine years imprisonment, execution suspended after three years, to be followed by four years of probation.

Following the imposition of his criminal sentence, the plaintiff filed this tax appeal in the Superior Court, contesting the validity of the tax that had been levied by the commissioner. In his appeal, the plaintiff claimed that the assessment constituted a second punishment for the same offense to which he previously had pleaded nolo contendere and had been sentenced. The plaintiff asserted that, consequently, the double jeopardy clause of the fifth amendment to the United States constitution precluded collection of the tax. The tax session of the Superior Court granted the plaintiff's motion for summary judgment on this issue, based upon the decision of the United States Supreme Court in *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 767. Relying on *Kurth Ranch*, the trial court concluded that Connect-

[7] General Statutes § 12-660 provides: "Penalties. Exemption from limitation on prosecution. (a) Any dealer who violates any provision of this chapter shall pay a penalty of one hundred per cent of the tax in addition to the tax imposed pursuant to section 12-651.

"(b) In addition to the penalty imposed pursuant to subsection (a) of this section, any person who violates any provision of this chapter shall be fined not more than ten thousand dollars or imprisoned not more than six years or both.

"(c) Notwithstanding the provisions of subsection (b) of section 54-193, a person may be prosecuted for a violation of any provision of this chapter more than five years after such violation."

[8] Initially, the commissioner had determined that the defendant owed $576,850. The commissioner thereafter reduced the sum owed based upon the toxicological report submitted by the department of health services indicating the actual amount of cocaine in the defendant's possession.

icut's tax on controlled substances constituted punishment for double jeopardy purposes and, therefore, could not be imposed upon the plaintiff because he had been punished previously for the same underlying conduct.[9] This appeal followed.

In reviewing a trial court's ruling on a motion for summary judgment when the material facts are undisputed, we must decide whether the trial court erred in concluding that the moving party was entitled to judgment as a matter of law. Practice Book § 384; *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 202, 663 A.2d 1001 (1995). The trial court based its conclusion on a record that consisted of a stipulation of facts, written briefs and oral arguments of counsel. The record before the trial court, therefore, was identical with the record before this court. Accordingly, our review of the ruling of the trial court is plenary, and we must determine whether the trial court's conclusions are legally and logically correct and find support in the facts appearing in the record. *Morton Buildings, Inc.* v. *Bannon*, 222 Conn. 49, 53–54, 607 A.2d 424 (1992).

The double jeopardy clause of the fifth amendment to the United States constitution provides that no person may "be subject for the same offense to be twice put in jeopardy of life or limb." The double jeopardy clause protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction and multiple punishments for the same offense. *North Carolina* v. *Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969).

---

[9] The trial court relied on the following factors in concluding that the tax constituted punishment: (1) the tax contained a high rate of taxation and had an obvious deterrent purpose; (2) the tax was conditioned on the commission of a crime; (3) the tax in practice operated the same way as the tax found to constitute punishment in *Kurth Ranch*; and (4) the legislative history of the Marijuana and Controlled Substances Tax Act indicated a purely punitive purpose.

The third of these protections is at issue in this appeal. We must determine, therefore, whether, under the United States Supreme Court's holding in *Kurth Ranch*, assessment of Connecticut's tax on controlled substances is a subsequent punishment barred by the double jeopardy clause when it is imposed on an individual who previously had been punished criminally for the same conduct.[10] We conclude that imposition of the tax does not violate double jeopardy principles.

In *Kurth Ranch*, the United States Supreme Court held that a Montana tax on the possession of illegal drugs assessed after a criminal penalty had been imposed for the same underlying misconduct violated the double jeopardy clause of the fifth amendment to the United States constitution. *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 783. Montana's Dangerous Drug Tax Act imposed a tax "on the possession and storage of dangerous drugs" that was to be collected only after state or federal fines or forfeitures had been satisfied. Id., 770. The amount of the tax was either 10 percent of the market value of the drugs as determined by the department of revenue or a specified amount depending upon the type of drug involved, whichever was greater.[11] Id. The Montana act further required that all law enforcement personnel report any person subject to the tax to the department of revenue.

[10] We note that two other state supreme courts have addressed the issue of whether a tax intended to be imposed immediately upon the possession of illegal drugs constitutes punishment under *Kurth Ranch*. See *State* v. *Lange*, 531 N.W.2d 108 (Iowa 1995); *State* v. *Gulledge*, 257 Kan. 915, 896 P.2d 378 (1995). Although, as here, the tax was in fact assessed after arrest, both courts determined that the tax did not constitute punishment for double jeopardy purposes. In making this determination, each court relied heavily on the fact that the tax was not conditioned upon arrest and was intended to be imposed upon drugs while in the taxpayer's possession. *State* v. *Lange*, supra, 115–17; *State* v. *Gulledge*, supra, 384–89.

[11] For example, the tax on marijuana was $100 per ounce while the tax on hashish was $250 per ounce. *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 770.

Id. The taxpayer had no obligation to file a return or to pay any tax *unless* and *until* he or she had been arrested. Id., 771. Under agency rules,[12] the taxpayer had to file a return within seventy-two hours of arrest.[13]

In *Kurth Ranch*, the defendants pleaded guilty to charges arising from their operation of a marijuana farm.[14] Thereafter, the defendants were sentenced in accordance with their plea agreements.[15] In a separate proceeding, the department of revenue imposed Montana's dangerous drug tax on the illegal drugs discovered on the Kurth Ranch property.[16]

The defendants challenged the imposition of the tax, claiming that the dangerous drug tax violated their double jeopardy right to be free from multiple punishments for the same offense. The Bankruptcy Court, the federal District Court and the Ninth Circuit Court of Appeals all agreed with the defendants and concluded that the tax was an additional punishment for the same offense that violated the double jeopardy clause. The state appealed to the United States Supreme Court.[17] In the

[12] The act authorized the department of revenue to adopt rules to administer and enforce the act. *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 770–71.

[13] If the taxpayer refused to file the return, law enforcement officials were required to file a return with the department of revenue on the items seized. *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 771.

[14] Law enforcement officials raided the Kurth ranch and confiscated a substantial amount of marijuana from the property. *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 771.

[15] Two of the defendants were sentenced to prison terms, while the others received suspended or deferred sentences. *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 772.

[16] The amount of the tax assessed was $894,940.99. *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 773 n.10.

[17] Initially, the Kurths challenged the assessment in administrative proceedings. Those proceedings, however, were stayed when the Kurths filed a petition for bankruptcy under chapter 11 of the Bankruptcy Code. During the bankruptcy proceedings, the Kurths challenged the constitutionality of Montana's Dangerous Drug Tax Act. Relying principally on *United States* v. *Halper*, 490 U.S. 435, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989), the

appeal, the Supreme Court was presented with the following question: "[W]hether a tax on the possession of illegal drugs assessed after the State has imposed a criminal penalty for the same conduct may violate the constitutional prohibition against successive punishments for the same offense." Id., 769.

Initially, the court recognized that "the unlawfulness of an activity does not prevent its taxation." Id., 778; see, e.g., *Marchetti* v. *United States*, 390 U.S. 39, 88 S. Ct. 697, 19 L. Ed. 2d 889 (1968) (upholding federal tax on gambling activities that were prohibited by state law); *James* v. *United States*, 366 U.S. 213, 81 S. Ct. 1052, 6 L. Ed. 2d 246 (1961) (upholding federal income tax on embezzled money imposed on person who had pleaded guilty to conspiracy to embezzle under state law); *United States* v. *Constantine*, 296 U.S. 287, 56 S. Ct. 223, 80 L. Ed. 233 (1935) (upholding federal excise tax on liquor sales that violated state law). The court, however, noted that " 'there comes a time in the extension of the penalizing features of the so-called tax when it loses its character [as such] and becomes a mere penalty with the characteristics of regulation and punishment.' " *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 779, quoting *A. Magnano Co.* v. *Hamilton*, 292 U.S. 40, 46, 54 S. Ct. 599, 78 L. Ed. 1109 (1934). Accordingly, the court was required to deter-

---

Bankruptcy Court concluded that the main purpose of the tax was deterrence, thereby necessitating a finding that the tax was punishment for double jeopardy purposes that could not be imposed after the defendants previously had been punished criminally. The District Court affirmed the judgment of the Bankruptcy Court. *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 774.

The Ninth Circuit Court of Appeals affirmed the judgment of the District Court and concluded that the statute as applied to the defendants was unconstitutional. The Court of Appeals did not rule that the statute was unconstitutional on its face, but rather noted that, because the state had refused to offer any evidence relating to whether the tax amount was rationally related to compensating the government for its loss under the *Halper* analysis, the statute was unconstitutional as applied to the defendants. Id., 775.

mine whether Montana's dangerous drug tax was so punitive in nature as to subject it to the constraints of the double jeopardy clause. *Dept. of Revenue of Montana* v. *Kurth Ranch,* supra, 778–79.

The court began its analysis by noting that although "neither a high rate of taxation nor an obvious deterrent purpose automatically marks this tax a form of punishment," these factors were at least consistent with a characterization of the tax as punishment. Id., 778. The court did not hold, however, that these attributes of the tax, which are present in Connecticut's scheme to tax illicit drugs, in and of themselves rendered Montana's drug tax punishment for double jeopardy purposes. Id., 781. The court focused primarily on two additional "unusual features" of the Montana tax that rendered it "a concoction of anomalies, too far-removed in crucial respects from a standard tax assessment to escape characterization as punishment for the purpose of double jeopardy analysis." Id., 783.

First, the imposition of the Montana tax was conditioned on the arrest of the taxpayer for the commission of a crime. The court noted that this feature of the Montana tax was "significant of penal and prohibitory intent rather than the gathering of revenue." Id., 781. The court recognized that in *United States* v. *Sanchez,* 340 U.S. 42, 71 S. Ct. 108, 95 L. Ed. 47 (1950),[18] it had "relied on the absence of such a condition to support its conclusion that a particular federal tax was a civil rather than a criminal sanction." *Dept. of Revenue of Montana* v. *Kurth Ranch,* supra, 511 U.S. 781. Significantly, the court noted that, by its terms, the Montana tax was to be "exacted *only* after the taxpayer has been

---

[18] In *Sanchez,* the court upheld the constitutional validity of a tax of $100 per ounce imposed pursuant to § 2590 (a) (2) of the Internal Revenue Code (now repealed) on all transfers of marijuana to any person who had not paid the special tax on marijuana and registered under §§ 2590 and 2591 of the code. *United States* v. *Sanchez,* supra, 340 U.S. 42.

arrested for the precise conduct that gives rise to the tax obligation in the first place." (Emphasis added.) Id. Accordingly, the court observed that persons arrested for possession of marijuana constituted the *entire* class of taxpayers subject to the tax. Id., 781–82.

Second, the court took cognizance of the fact that although the Montana tax purported to be a property tax on the possession and storage of illegal drugs, in practice it could never be levied at a time when the taxpayer either owned or possessed the goods. Because the tax was predicated upon arrest, law enforcement officials presumably had already confiscated and destroyed the illegal contraband, thereby divesting the taxpayer of possession of the illicit drugs at the time of the imposition of the tax. Id., 783. The court observed that a statute that imposes a tax on goods at a time when such goods no longer exist possesses a punitive character. Id.

Connecticut's act that taxes illegally possessed controlled substances, however, does not contain either of the "unusual features" that figured prominently in the Supreme Court's conclusion that Montana's dangerous drug tax constituted punishment for double jeopardy purposes. Connecticut's tax is neither predicated upon arrest nor is it assessed on property that necessarily has been confiscated or destroyed. Specifically, the act provides that the tax is owed *"immediately* upon acquisition or possession in this state by a dealer." (Emphasis added.) General Statutes § 12-651 (c).[19] Accordingly, the tax obligation does not depend on the dealer's arrest, which in the normal course of events would result in the confiscation and destruction of the controlled sub-

---

[19] A dealer is defined as "any person who . . . manufactures, produces, ships, transports, or imports into the state or in any manner acquires or possesses more than forty-two and one-half grams of marijuana or seven or more grams of any controlled substance . . . ." General Statutes § 12-650 (3).

stances. *Dept. of Revenue of Montana* v. *Kurth Ranch,* supra, 511 U.S. 783. The dealer can satisfy the tax obligation by paying the tax promptly upon his or her acquisition of the drugs and by affixing the required tax stamps. Accordingly, unlike Montana's tax scheme, in Connecticut persons who have been arrested for drug possession do not constitute the entire class of taxpayers subject to the tax and the taxpayer is not necessarily divested of the drugs before the tax is imposed. See id., 782–83.[20]

Additionally, our act provides safeguards that further separate the tax from the criminal process, permitting confidential payment of the tax and prohibiting use of the tax information in any criminal proceeding against the taxpayer, except for one involving taxes due under the act itself, unless the information was obtained from some other source. General Statutes § 12-659. The taxpayer, consequently, may file without risk of self-incrimination. General Statutes § 12-659.

We acknowledge that in many, if not most, cases Connecticut's tax will not be imposed until the taxpayer has been arrested and until the illegal drugs have been confiscated or destroyed. The practicalities surrounding the imposition of the tax, however, merely reflect the reality of attempting to tax an illegal activity. *Dept. of Revenue of Montana* v. *Kurth Ranch,* supra, 511 U.S. 788 (Rehnquist, C. J., dissenting). The taxpayer's voluntary choice to ignore his or her tax obligations should not be the determinative factor in evaluating

---

[20] We also note that the tax is not automatically imposed upon a person possessing any amount of the named drugs. For the tax to be assessed, the taxpayer must at a minimum possess, acquire, manufacture or transport more than forty-two and one-half grams of marijuana or seven or more grams of any other controlled substance that is sold by weight. General Statutes § 12-650 (3). As such, the "casual user" is not subject to the tax; rather, only those who possess sufficient amounts to lead one reasonably to believe that they are involved in the drug trade are subject to the tax. Consequently, some persons may possess an illegal substance and yet not be subject to the tax.

whether Connecticut's tax constitutes punishment in the double jeopardy context. The legislature provided that the information obtained from an individual complying with the statutory requirements cannot be disclosed to law enforcement officials, thereby providing an avenue for the taxpayer to comply with the law without the necessity of providing incriminating information. It would be anomalous indeed if persons conducting an illegal business were excused from the payment of a tax on that business because the failure to pay the tax was not discovered, as a result of their own dereliction, until after they had been arrested and double jeopardy protection attached. See *United States* v. *Constantine*, supra, 296 U.S. 293.[21]

In support of his contention that the tax serves a purely punitive function, the plaintiff claims that a review of the legislative history of Connecticut's Marijuana and Controlled Substances Tax Act indicates that there existed a clear legislative intent to use the tax to punish those who traffic in illegal drugs.[22] Our examination of the legislative history of the act, however, does not indicate that the tax was enacted solely for a punitive purpose. While it is beyond question that the tax was intended to some extent to act as a deterrent to participation in the drug trade, legislators expressed the desire to "address tax evasion in an underground economy"; Conn. Joint Standing Committee Hearings, Finance, Revenue and Bonding, Pt. 1, 1991 Sess., p. 170; and "[to open] another door to law enforcement officials on the civil side [because] failure to pay a

---

[21] We recognize that persons engaged in the drug trade may not be aware that the § 12-651 tax obligation exists. It is, however, well established that ignorance of the law is not a defense to one's failure to abide by the letter of the law. See *Cheek* v. *United States*, 498 U.S. 192, 199, 111 S. Ct. 604, 112 L. Ed. 2d 617 (1991).

[22] In *Kurth Ranch*, the court did not examine the legislative history, presumably because the statute on its face evidenced a purely punitive purpose. *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 774.

tax [results in] the dealer [being] treated as any other delinquent taxpayer . . . ." 34 H.R. Proc., Pt. 21, 1991 Sess., pp. 7817–18, remarks of Representative John W. Thompson. Legislators also hoped that it "would produce money for the state while imposing a burden on those who deal drugs." 34 S. Proc., Pt. 9, 1991 Sess., p. 3227, remarks of Senator George Jepsen.

While we recognize that the legislative history of Connecticut's tax reveals some indication of a deterrent purpose underlying the enactment of the legislation, we also recognize that the legislative history indicates a legislative purpose to raise substantial revenue by taxing an unregulated and underground economy that is extremely profitable yet free of tax liability. We note, in addition, that "[i]t is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed. *Sonzinsky* v. *United States*, 300 U.S. 506, [513–14, 57 S. Ct. 554, 81 L. Ed. 772] (1937). The principle applies even though the revenue obtained is obviously negligible . . . or the revenue purpose of the tax may be secondary, *Hampton & Co.* v. *United States*, 276 U.S. 394 [48 S. Ct. 348, 72 L. Ed. 624] (1928)." (Citation omitted.) *United States* v. *Sanchez*, supra, 340 U.S. 44. Further, an obvious deterrent purpose does not alone render a civil or administrative sanction punishment for double jeopardy purposes. *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 779. Accordingly, even though the revenue raising purpose of the tax on illegal drugs may be secondary, Connecticut's marijuana and controlled substances tax does not rise to the level of punishment, and therefore does not implicate the double jeopardy clause. The constitution permits the legislature to tax this lucrative yet illegal business in order to acquire revenue, while at the same time using the tax as a deterrent to those considering

entry into that illegal business. *United States* v. *Sanchez*, supra, 44.

In sum, we conclude that Connecticut's Marijuana and Controlled Substances Tax Act does not possess either of the idiosyncratic features on which the United States Supreme Court focused in *Kurth Ranch* in declaring that a tax assessed pursuant to Montana's tax on illicit drugs constitutes punishment for double jeopardy purposes. Specifically, the imposition of Connecticut's tax is not conditioned upon arrest and is intended to be assessed while the taxpayer is in actual possession of the drugs. In addition, the legislative history does not evince a purely punitive intent, but indicates a genuine effort by the legislature to raise income by taxing an untapped source of revenue, a constitutionally permissible practice. We therefore conclude that the imposition of the tax on the plaintiff's illegal drugs after he had been prosecuted for the same underlying misconduct does not violate the double jeopardy clause.

The judgment is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.

In this opinion PETERS, C. J., and BORDEN, NORCOTT and PALMER, Js., concurred.

KATZ, J., with whom BERDON, J., joins, dissenting. Because, in accordance with the well reasoned opinion of the trial court, I would find that the double jeopardy clause of the fifth amendment to the United States constitution was violated when the plaintiff, following his judgment of conviction for possession of illicit drugs, was assessed a tax pursuant to Connecticut's Marijuana and Controlled Substances Tax Act (act); General Statutes §§ 12-650 through 12-660; I respectfully dissent.

In deciding that Connecticut's act crosses the line between revenue raising and punishment, I begin, as

did the majority of this court, with the United States Supreme Court's decision in *Dept. of Revenue of Montana* v. *Kurth Ranch*, 511 U.S. 767, 114 S. Ct. 1937, 128 L. Ed. 2d 767 (1994), as a guide. Therein the court stated that although a sanction may possess both punitive and remedial features, a court faced with a challenge based on double jeopardy grounds must determine whether the sanction is fairly characterized as remedial or punitive. In deciding that question, a trial court should review the sanction's legislative history and examine the nature and structure of the statute. As the court noted, "at some point, an exaction labeled as a tax approaches punishment, and [the court's] task is to determine whether [the state's] drug tax crosses that line." Id., 780.

To aid in this task, the court employed an "unusual features" analysis to conclude that an assessment of Montana's dangerous drug tax amounted to a second punishment prohibited by the double jeopardy clause. Because the tax was conditioned on the arrest of the taxpayer for the commission of a crime, and because the tax, in practice, could be levied only at a time when the taxpayer no longer either owned or possessed the goods, the Supreme Court concluded that the tax was so punitive in nature as to subject it to the constraints of the double jeopardy clause. Id., 781–83. In light of the statute's obvious punitive purpose, as evidenced by those two unusual features, the court in *Kurth Ranch* did not examine the legislative history of Montana's tax act.

In concluding that Connecticut's tax does not constitute punishment for double jeopardy purposes, the majority distinguishes Montana's tax in that our tax does not possess either of the two "idiosyncratic features" on which the *Kurth Ranch* court focused. In *Kurth Ranch*, however, the court "did not hold that a tax must contain each of the [Montana act's] 'punish-

ment' aspects, or only the [Montana act's] 'punishment' aspects, to constitute a punishment within the meaning of the double jeopardy clause." *Clifft* v. *Indiana Dept. of State Revenue*, 641 N.E.2d 682, 693 (Ind. 1994). The determination that "an exaction labeled as a tax" approaches punishment depends on a variety of considerations and a "concoction of anomalies"; *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 780, 783; that reflect legislative intent.

"Because our fundamental objective in construing a statute is to ascertain and give effect to the apparent intent of the legislature; *Fleming* v. *Garnett*, 231 Conn. 77, 91–92, 646 A.2d 1308 (1994); *State* v. *Metz*, 230 Conn. 400, 409, 645 A.2d 965 (1994); we will not undertake an examination of [General Statutes § 12-651 (a)] with blinders on regarding what the legislature intended [it] to mean. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). Accordingly, our analysis of [General Statutes § 12-651 (a)] is not limited solely to the words of the statute. Instead, we must also look . . . to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. *State* v. *Metz*, supra, 409; *Fleming* v. *Garnett*, supra, 92." (Internal quotation marks omitted.) *Derwin* v. *State Employees Retirement Commission*, 234 Conn. 411, 420, 661 A.2d 1025 (1995). In this case, I believe the legislative intent to punish is clear from the specific comments of the legislators sponsoring the bill as well as from a gathering of the indicators relied upon by the Supreme Court in *Kurth Ranch*.

The legislative history of the act expressly articulates a punitive purpose. Indeed, as the trial court noted, these expressions are pervasive. Representative John W. Thompson, the sponsor of the bill in the House of Representatives, stated that: "We have various drug and

seizure laws which [provide that] if a drug dealer is arrested in commitment of a crime, in possession of drugs and the drugs are found in a house, a boat, a car, for example, the law enforcement officials may seize that house, drug or boat and that becomes property of the state. However, the law does not permit law enforcement officials to reach beyond that to whatever resources those individuals may have, such as cash resources, other businesses and so on. This bill would allow law enforcement officials to reach beyond the immediate seizure and to attack criminals' assets, bank accounts, homes, property and so on." 34 H.R. Proc., Pt. 21, 1991 Sess., p. 7809. Although he acknowledged that "the collection of money is part of the process . . . [a] more important part of this legislation is really to put a crimp in the operation of the drug dealer." Id., p. 7814. Representative Thompson stated in closing that the tax does "expand the opportunity for law enforcement officials to go after these people, not only through criminal proceedings, but also through civil action." Id., p. 7818.

Speaking in support of the act, Representative John G. Metsopoulos expressed, in no uncertain terms, the penal nature of the act. He stated: "[Y]ou know, I think the concept is good because what you're doing is you're double-whacking the offender. You're getting him with the jail term and you're getting him with any fines that he may incur through civil or legal offenses. You're then getting him with the tax that 'he would have to pay' if he was selling this substance." Id., p. 7813. Representative Curtis D. Andrews, Jr., expressed his view that the tax is "primarily a law enforcement tool. Secondarily, it's a revenue raiser, but it is primarily a law enforcement tool." Id., p. 7817.

The debate in the Senate was comparatively brief. Senator George Jepsen, the sponsor of the bill in the Senate, spoke nothing of its revenue raising purpose.

On the contrary he stated: "This bill very simply imposes one more burden on drug dealers in our state . . . ." 34 S. Proc., Pt. 9, 1991 Sess., p. 3227.

Additionally, while the act does not in principle depend upon an arrest;[1] General Statutes § 12-651 (a); it is made exclusively applicable to illegal activity by General Statutes § 12-658, which provides that "[t]he provisions of this chapter shall not be construed to require persons lawfully in possession of marijuana or a controlled substance pursuant to any provision of the general statutes to pay the tax imposed pursuant to section 12-651." See General Statutes § 12-650 (1) and (2) (defining marijuana and controlled substances, for purposes of the act, as any marijuana and controlled substance "that is held, possessed, transported, sold or offered to be sold *in violation of any provision of the general statutes*" [emphasis added]); see also General Statutes § 12-650 (3) (defining dealer as "any person who, *in violation of any provision of the general statutes* . . . ." [emphasis added]). Conditioning the tax

[1] The majority emphasizes that because the tax is assessed at the time of possession, and not solely at the time of arrest, it is distinct from the Montana tax. In reality, this is a distinction without a difference. As Chief Justice Rehnquist observed in his dissent in *Kurth Ranch:* "[I]ndividuals cannot be expected to voluntarily identify themselves as subject to the tax." *Dept. of Revenue of Montana* v. *Kurth Ranch,* supra, 511 U.S. 788 n.2. Furthermore, although in theory the tax can be imposed independent of an arrest, Connecticut law enforcement officers, like their counterparts in Montana, have an obligation to complete and submit a drug tax referral form to the department of revenue services identifying the total amount and type of drugs found and indicating that the tax stamps were not present and affixed to the drugs. See Connecticut Informational Publication, IP 92 (7): Questions and Answers for the Criminal Justice and Law Enforcement Agencies on the Connecticut Marijuana and Controlled Substances Tax (Dept. of Revenue Services 1992). Finally, although those subject to the tax can voluntarily declare the drugs and pay the tax, the amount of revenue that has been generated is negligible. As of June 7, 1994, three years after the tax statute was enacted, the initial cost of designing and printing the drug tax stamps had not been recovered through the imposition of the tax. D. Lightman, "State 'Grass Tax' Endangered," Hartford Courant, June 7, 1994, p. A1.

on unlawful possession is "significant of penal and prohibitory intent." *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 781. When the taxed activity is completely forbidden, any legitimate revenue raising purpose that might support the tax could be equally well served by increasing the fine imposed upon conviction of the criminal offense.[2] Id., 780. Tax on goods that the taxpayer did not lawfully possess "has an unmistakable punitive character. This tax, imposed on criminals and no others, departs so far from normal revenue laws as to become a form of punishment." Id., 783.

Finally, although they are not dispositive, two additional features of the act are at least consistent with a punitive character: the high rate of tax, comparable to the tax that the Supreme Court suggested was unrivaled in the world of taxes;[3] id., 780 n.17; and the fact that it is the same sovereign that imposes the tax that also criminalizes the activity.[4] Id., 782 n.22.

---

[2] It is noteworthy that the profits from what the state refers to as "the illegal drug trade" are also subject to income taxation under General Statutes § 12-700 et seq., and to sales taxation under General Statutes § 12-406 et seq. Because these taxes apply equally to legal and illegal activities, they do not violate the double jeopardy clause but rather serve the state's goals of subjecting drug sales to economic sanctions and of funding worthier enterprises.

[3] Section 12-651 (b) (2) provides that one gram of cocaine is to be taxed at $200. The market value of $100 for a gram of cocaine was attested to by an affidavit accompanying the amicus brief of the division of criminal justice. Therefore, the tax is 200 percent of the value. Additionally, the penalty for failure to pay the tax is 100 percent of the tax in addition to the tax imposed pursuant to § 12-651. See General Statutes § 12-660 (a). Therefore, if a dealer in possession does not self assess by affixing the proper stamps pursuant to General Statutes § 12-654, he or she is liable for 400 percent of the market value of the controlled substance. This is the same percentage relationship characterized by the Supreme Court as "unrivaled." *Dept. of Revenue of Montana* v. *Kurth Ranch*, supra, 511 U.S. 780 n.17.

[4] Consequently, it is unnecessary to consider the question of whether the dual sovereignty doctrine makes the double jeopardy clause inapplicable. See *United States* v. *All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483 (2d Cir. 1995); see also note, "Popular Sovereignty, Double Jeopardy, and the Dual Sovereignty Doctrine," 102 Yale L.J. 281, 296 (1992).

It is important to note that the validity of the act is not in question. The question, rather, is whether the tax is a punishment for the purpose of the double jeopardy clause. The fifth amendment does not prevent imposition of the tax; it merely restricts the ability of the state to seek additional sanctions in criminal proceedings against those who possess marijuana or controlled substances from whom taxes have already been collected. Similarly, it restricts the ability of the state to impose a tax on goods the possession of which have served as the basis of criminal proceedings.

In conclusion, I believe that the act provides for a second punishment, and not the kind of remedial sanction that may follow the punishment of a criminal offense. Accordingly, I would affirm the judgment of the trial court.